**No. 7:21-cv-05782 (VB)**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

TRANSFORM HOLDCO LLC

*Appellant,*

– v. –

SEARS HOLDINGS CORPORATION, ET AL.,

*Appellees.*

## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK (DRAIN, J.)

### IN RE SEARS HOLDINGS CORPORATION, ET AL, CASE NO. 18-23538

# BRIEF FOR APPELLANT

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
Sean A. O'Neal
Andrew Weaver
Samuel Levander
One Liberty Plaza
New York, New York 10006
Tel. (212) 225-2000
Fax (212) 225-3999
soneal@cgsh.com

*Attorneys for Appellant Transform Holdco LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 8012 and 8014(a)(1) of the Federal Rules of Bankruptcy Procedure, Appellant Transform Holdco LLC, by and through its undersigned counsel, certifies as follows:

Hoffman Topco LLC is the parent corporation of Transform Holdco LLC.  No public corporation directly or indirectly owns 10% of Transform Holdco LLC's stock.

## TABLE OF CONTENTS

**PAGE**

Corporate Disclosure Statement .......................................................................... ii

Table of Authorities ........................................................................................... iv

Statement Regarding Oral Argument................................................................... 1

Jurisdictional Statement ..................................................................................... 1

Statement of Issues Presented............................................................................. 1

Applicable Standard of Review .......................................................................... 2

Preliminary Statement......................................................................................... 3

Statement of the Case.......................................................................................... 6

I. Factual Background ......................................................................................... 6

A.   The Sears Bankruptcy and Going-Concern Sale .......................................... 6

II. Procedural History and Ruling Presented for Review .................................. 20

Summary of the Argument................................................................................. 25

Argument ........................................................................................................... 26

I. The Bankruptcy Court Erred in Construing the APA to Provide that
Transform Did Not Acquire All of the Assets of the Foreign Subsidiaries...................... 26

A.   Transform Acquired the Foreign Subsidiary Cash under the Plain
Language of Section 2.13(a) of the APA........................................................ 27

B.   The Debtors Seek to Make a Legal Fiction a Reality ................................. 30

II. The Bankruptcy Court Erred by Consulting Parol Evidence to Interpret
Unambiguous Contract Language...................................................................... 33

III. The Bankruptcy Court Erred by Finding that the Parol Evidence
Favors the Debtors ............................................................................................ 36

IV. The Bankruptcy Court Improperly Relied on Evidence Outside the
Record to Deny Transform's Acquiescence Claim ........................................... 42

Conclusion ......................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 363 ............................................................................................ 6

11 U.S.C. §1129(a)(9) ................................................................................ 18

28 U.S.C. §§ 157(a)-(b) .............................................................................. 1

28 U.S.C. § 158(a)(1) .................................................................................. 1

28 U.S.C. § 1334(b) .................................................................................... 1

Federal Rule of Bankruptcy Procedure 8015(a)(5) .................................... 47

Federal Rule of Bankruptcy Procedure 8015(a)(6) .................................... 47

Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) ........................... 47

Federal Rule of Bankruptcy Procedure 8015(g) ........................................ 47

Local Rule 9014-2 .................................................................................. 20, 43

Rule 8019 of the Federal Rules of Bankruptcy Procedure ......................... 1

Rules 8012 and 8014(a)(1) of the Federal Rules of Bankruptcy Procedure ...................... 2

**Cases**

Alta Berkeley VI C.V. v. Omneon, Inc.,
41 A.3d 381 (Del. 2012) ...................................................................... 2, 27, 35

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill, Lynch, Pierce,
Fenner & Smith Inc.,
232 F.3d 153 (2d Cir. 2000) ...................................................................... 2

Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,
702 A.2d 1228 (Del. 1997) ...................................................................... 35

In re Lucas,
477 B.R. 236 (Bankr. M.D. Ala. 2012) ...................................................... 31

Julian v. Julian,
C.A. No. 1892-VCP, 2010 WL 1068192 (Del. Ch. Mar. 22, 2010) ................................... 41

Klaassen v. Allegro Dev. Corp.,
106 A.3d 1035 (Del. 2014) ............................................................................ 3, 42, 44

Kuhn Constr., Inc. v. Diamond State Port Corp.,
990 A.2d 393 (Del. 2010) ............................................................................................. 29

Lee v. BSB Greenwich Mortg. Ltd.,
267 F.3d 172 (2d Cir. 2001) .................................................................................. *Passim*

Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.,
Civil Action No. 8321-VCG, 2014 WL 718430 (Del. Ch. Feb. 25, 2014) ........................ 42

Linde v. Arab Bank, PLC,
882 F.3d 314 (2d Cir. 2018) ........................................................................................ 30

Lorillard Tobacco Co. v. Am. Legacy Found.,
903 A.2d 728 (Del. 2006) ...................................................................................... 26, 28

Matria Healthcare, Inc. v. Coral SR LLC,
C.A. No. 2513-N, 2007 WL 763303 (Del. Ch. Mar. 1, 2007) ........................................ 29

Milligan v. CCC Information Servs. Inc.,
920 F.3d 146 (2d Cir. 2019) ........................................................................................ 30

Nevins v. Bryan,
885 A.2d 233 (Del. Ch. 2005) ...................................................................................... 45

Osborn ex rel. Osborn v. Kemp,
991 A.2d 1153 (Del. 2010) .......................................................................................... 26

Pellaton v. Bank of New York,
592 A.2d 473 (Del. 1991) ............................................................................................ 33

Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,
616 A.2d 1192 (Del. 1992) .......................................................................................... 34

S.I. Management L.P. v. Winninger,
707 A.2d 37 (Del. 1998) .............................................................................................. 35

SimplexGrinnell LP v. Integrated Systems & Power, Inc.,
642 F. Supp. 2d 167 (S.D.N.Y. 2009) (Lynch, J.) ........................................................ 33

<u>Sunbeam Prod., Inc. v. Wing Shing Prod. (BVI) Ltd.</u>,
311 B.R. 378 (S.D.N.Y. 2004), *aff'd*, 153 F. App'x 703 (Fed. Cir. 2005).........................  2

<u>Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.</u>,
206 A.3d 836 (Del. 2019) .....................................................................................  26

<u>Tiffany & Co. v. Costco Wholesale Corp.</u>,
971 F.3d 74 (2d Cir. 2020).....................................................................................  29

<u>Tosco Corp. v. Oxygenated Mktg. & Trading A.G.</u>,
1999 WL 328342 (S.D.N.Y. May 24, 1999), *aff'd sub nom.*, <u>Bayway Refin. Co. v.
Oxygenated Mktg. & Trading A.G.</u>, 215 F.3d 219 (2d Cir. 2000) ....................................  39

<u>Wohl v. Owen</u>,
580 N.Y.S.2d 854 (N.Y. Sup. Ct. 1992) ............................................................  31

## <u>Other Authorities</u>

*Lieu*, *Merriam-Webster Dictionary*, https://merriam-webster.com/dictionary/lieu (last
visited Aug. 13, 2021)...........................................................................................  28-29

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 8019 of the Federal Rules of Bankruptcy Procedure, Appellant Transform Holdco LLC ("Transform") respectfully requests oral argument on this appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from a final order entered by the Bankruptcy Court on June 15, 2021. Transform timely filed a notice of appeal on June 16, 2021. The Bankruptcy Court had subject-matter jurisdiction under 28 U.S.C. §§ 157(a)-(b) and 28 U.S.C. § 1334(b). This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED

1. Did the Bankruptcy Court err in concluding that, under Section 2.13(a) of the First Amendment to the APA, Transform did not acquire all of the assets of the Debtors' former Indian and Hong Kong subsidiaries, including the cash held in their bank accounts, when acquiring "all of the equity interests" in these subsidiaries?

2. Given that the plain meaning of Section 2.13(a) is unambiguous, did the Bankruptcy Court err by considering parol evidence outside the four corners of the agreement?

3. Did the Bankruptcy Court err in concluding that the parol evidence supports the Debtors' interpretation of Section 2.13(a)?

4.    Did the Bankruptcy Court err by rejecting Transform's acquiescence argument, including by relying – without holding an evidentiary hearing – on the purportedly "uncontroverted" testimony of a declarant the Debtors failed to make available for cross-examination and whose declaration was not moved into or otherwise entered into the record?

## APPLICABLE STANDARD OF REVIEW

"When contract terms are unambiguous, contract interpretation is a matter of law to be reviewed *de novo* on appeal to district court." *Sunbeam Prod., Inc. v. Wing Shing Prod. (BVI) Ltd.*, 311 B.R. 378, 391 (S.D.N.Y. 2004), *aff'd*, 153 F. App'x 703 (Fed. Cir. 2005); *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("A judicial interpretation of a contract presents a question of law that this Court reviews *de novo*.").

"[A] lower court's threshold determination as to whether a contract is ambiguous . . . is subject to *de novo* review." *Lee v. BSB Greenwich Mortg. Ltd.*, 267 F.3d 172, 178 (2d Cir. 2001) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill, Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) ("The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court.").

The doctrine of acquiescence is an equitable defense that presents a mixed question of law and fact. *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014). Appellate courts review questions of law related to acquiescence *de novo* and questions of fact for clear error. *Id.*

## PRELIMINARY STATEMENT

More than two years after selling substantially all of the Debtors' assets to Appellant Transform as part of the Sears bankruptcy, the Debtors now seek to rewrite the plain and unambiguous contractual language of the Parties' Asset Purchase Agreement (the "APA")[1] in an effort to seize cash from certain non-debtor foreign subsidiaries (the "Foreign Subsidiaries"[2]) following the transfer of "all equity interests" in these Foreign Subsidiaries to Transform. The Debtors' principal argument before the Bankruptcy Court was that a transaction whereby Transform acquired "all of the equity interests" in the Foreign Subsidiaries meant something

---

[1] The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief*, Docket No. 2507 (A-510) (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, Docket No. 2599 (A-1713) (the "Notice of Filing of Amendment No. 1 to the APA").

[2] The Foreign Subsidiaries are Sears Sourcing India Private Limited, Sears IT and Management Services India Private Limited, Sears Global Technologies India Private Limited (the "Indian Subsidiaries"), Sears Holdings Global Sourcing Limited, International Sourcing & Logistics Limited, Quality Assurance Laboratory Limited (the "Hong Kong Subsidiaries," and together with the Indian Subsidiaries, the "Foreign Subsidiaries").

other than that Transform acquired all of the assets and liabilities of those Foreign Subsidiaries, including the cash held in their bank accounts at the time of closing. The Bankruptcy Court erred by consulting parol evidence (and only selective parol evidence) in interpreting the unambiguous language of the contract to alter the mechanics of a commonly understood commercial transaction.

Section 2.13 of the APA provided Transform with two options to effectuate the transfer of the Foreign Subsidiaries.  Transform could either:  (i) acquire certain assets and assume limited liabilities of the foreign subsidiaries, consistent with the terms under which Transform would acquire certain assets and limited liabilities of the Debtors (which excluded certain assets, such as cash in bank accounts); or (ii) "acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities."  The choice belonged solely to Transform, and it chose the latter option.  By acquiring "all of the equity interests" in these Foreign Subsidiaries, "in lieu of the acquisition of assets and assumption of liabilities," it should be (and for two years was) uncontroversial that Transform acquired all of the assets and all the liabilities of these Foreign Subsidiaries, including the cash in the relevant bank accounts at the time of closing (the "Foreign Subsidiary Cash").  That is the only tenable reading of Section 2.13(a) of the APA consistent with its plain meaning.  However, even though the Bankruptcy Court agreed that the plain meaning of "equity interests" encompasses all asset and

liabilities, the Bankruptcy Court erred by considering parol evidence, consulting witness testimony that was not (and could not have been) admitted into evidence without an evidentiary hearing, and concluding that the Debtors offered the "better interpretation," finding that "equity interests" here did not include the Foreign Subsidiary Cash.

If the Bankruptcy Court needed to consult extrinsic evidence (following a determination that the contract was ambiguous and a proper evidentiary hearing to admit and consider parol evidence), then it should have considered the Parties' course of conduct over the two years after executing the APA and closing the transaction, which unquestionably reflected an understanding that Transform acquired all of the assets of the Foreign Subsidiaries. Beyond never identifying the Foreign Subsidiary Cash to the Bankruptcy Court as an asset of the estate (even though the Debtors had full access to the Foreign Subsidiaries' books and records at the time of the sale), when the parties executed a stock purchase agreement for the Hong Kong Subsidiaries, the Debtors did not try to exclude any assets (or liabilities) from the transaction. For two years, the Debtors confirmed through their actions and statements to the Bankruptcy Court that Transform's plain-meaning interpretation of the APA is correct. The Bankruptcy Court's Order should be reversed.

<h1 style="text-align:center">STATEMENT OF THE CASE</h1>

## I.  FACTUAL BACKGROUND

### A.  The Sears Bankruptcy and Going-Concern Sale

The Debtors filed for bankruptcy on October 15, 2018, and immediately began to solicit bids to sell some or all of their assets under 11 U.S.C. § 363. After intensive negotiations and a competitive auction, the Debtors' Restructuring Committee[3] selected Transform's bid to acquire substantially all of the Debtors' assets as the highest and best. The Debtors and Transform reflected the terms of this winning bid in the APA, which they executed on January 17, 2019. Several parties, including the Unsecured Creditors' Committee ("UCC"), opposed Transform's bid, and the Bankruptcy Court scheduled a multi-day hearing (the "Sale Hearing") to rule on these objections and determine whether to approve the sale.[4]

Section 2.13 of the APA was entitled "Foreign Assets" and provided in relevant part:

> (a) On the Closing Date, Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such

---

[3]  Sears' Board of Directors created a Restructuring Committee and Restructuring Subcommittee, both composed of independent directors, to recommend a transaction to Sears' Board and review potential causes of action in connection with pre-petition transactions.

[4]  At the Sale Hearing, the sale to Transform was supported by the Debtors (represented by Weil, Gotshal & Manges LLP), the Restructuring Subcommittee (represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP), and ESL Investments, Inc. ("ESL") (represented by Cleary Gottlieb Steen & Hamilton LLP), which made the winning bid on behalf of Transform, which was a newly formed entity. The opposition to the sale was led by the UCC (represented by Akin Gump Strauss Hauer & Feld LLP).

applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business other than the Excluded Assets and any other assets of the type that would have been Acquired Assets had they had been owned by Sellers as of the Closing Date or any minority equity interests held by the Foreign Subsidiaries (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances. If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable following the Closing Date and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.

\* \* \*

(c) No purchase of Acquired Foreign Assets or equity interests pursuant to this Section 2.13 shall require the delivery of any additional consideration by Buyer; provided, that to the extent required by applicable Law (including, for the avoidance of doubt, Tax Law), Buyer and Seller shall in accordance with Section 9.3(d) either (i) allocate a portion of the Purchase Price to the purchase of such equity interests or (ii) provide for nominal consideration to be paid by Buyer to Sellers in an amount no greater than the minimum amount required by applicable Law.

Under Sections 2.2(f) and (n) of the APA, cash in the bank accounts of the Debtors and certain of their domestic subsidiaries would be Excluded Assets that Transform would not acquire in the transaction.  Section 2.13 provided distinct treatment, however, for the assets and liabilities of the foreign subsidiaries.[5]

---

[5]     The Debtors and certain of their domestic subsidiaries were the sellers under the APA.  The Debtors' foreign subsidiaries and certain bankruptcy-remote domestic subsidiaries had not filed for bankruptcy in the United States and were not (nor could they have been) sellers under the APA. The transfer of these non-debtor subsidiaries' assets and liabilities were therefore addressed under

After the APA was executed and before the Sale Hearing, the Debtors and Transform began to discuss modifications to the terms of certain provisions of the APA, which they were to codify in the First Amendment to the APA.  By the time the Sale Hearing began on February 4, 2019, the Debtors and Transform had agreed to the terms of certain provisions of the First Amendment, and were continuing to negotiate other points.

The First Amendment was discussed on the record on each of the three days of the Sale Hearing, and it was the subject of extensive negotiations by all parties, including the UCC, outside the courtroom during this time.  While the litigators representing the parties presented arguments and examined witnesses during the Sale Hearing, their respective firms' M&A attorneys were negotiating the terms of the First Amendment.  *See* Sept. 12, 2019 Hr'g Tr. at 132:15-20 (A-6847) (counsel for the Debtors describing that during the week prior to February 8 "the advisors to the Debtor and advisor to the UCC – were actually litigating against each other . . . the M&A folks were drafting the first amendment to the APA").

On the first day of the Sale Hearing, counsel for the Restructuring Subcommittee referred to the draft First Amendment that was "going back and forth between the Subcommittee and ESL," and stated that they would "show it to the

---

distinct provisions of the APA.  *See, e.g.*, APA § 2.1(s) (providing that Transform acquired "all equity interests" of the bankruptcy-remote Sparrow subsidiaries); APA § 2.13(a) (providing Transform with the option to acquire "all of the equity interests" of the Foreign Subsidiaries).

[UCC]." Feb. 4, 2019 Hr'g Tr. at 32:20-33:8 (A-5265-5466). By the second day of the Sale Hearing, counsel for the UCC had received a version of the First Amendment and offered to introduce it into evidence. Feb. 6, 2019 Hr'g Tr. at 289:16-20 (A-5478) ("Now, I am going to mark for identification as exhibit 181 an amendment to the asset purchase agreement that the committee received late last night, your Honor."). Later that night, the UCC sent comments to the 30-page First Amendment to the Debtors, the Restructuring Subcommittee, and Transform, noting that the proposed amendment "remains subject to further review and comment in all respect." *Declaration of Sean A. O'Neal in Support of Transform Holdco LLC's Supplemental Memorandum of Law in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9485 ("O'Neal Decl."), Ex. A (A-4739), Email from Philip Dublin, Counsel to the UCC (Feb. 6, 2019).

As to Section 2.13, the draft First Amendment made the following changes (blue, double underline language represents new language, and red struck-through language represents deleted language), including providing Transform an option of acquiring all of the equity interests in the Foreign Subsidiaries, in lieu of acquisition of assets and assumption of liabilities set forth in the original APA:

> (a) On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or

under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date or ~~any~~ minority equity interests in non-U.S. Persons held by ~~the Foreign~~ Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date. If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable ~~following the Closing Date~~ and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated. If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets. If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

\* \* \*

(c) No purchase of Acquired Foreign Assets or equity interests pursuant to this Section 2.13 shall require the delivery of any additional consideration by Buyer; provided, that to the extent required by applicable Law (including, for the avoidance of doubt, Tax Law), Buyer and Seller shall in accordance with Section 9.3(d) either (i) allocate a portion of the Purchase Price to the purchase of such equity interests or (ii) provide for nominal consideration to be paid by Buyer to Sellers in an amount no greater than the minimum amount required by applicable Law.

At 6:53 AM on February 7, 2019, the final day of the Sale Hearing, the Debtors filed a substantially final draft of the First Amendment with the Bankruptcy Court. *Notice of Filing Amendment to the Asset Purchase Agreement*, ECF No. 2456 (A-355). That document filed with the Bankruptcy Court included the final language of Section 2.13(a), which had not changed during the negotiations. *See Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, ECF No. 2599 at 355-56 (A-2067-2068) (redline of the February 7, 2019 draft to the final version of the First Amendment showing that there were no changes to Section 2.13) (a. At the UCC's request, the Debtors sent them an editable version of the First Amendment that morning before the start of the final day of the hearing. O'Neal Decl., Ex. C, Email from Naomi Munz, Counsel to the Debtors (Feb. 7, 2019) (A-4735). In court that morning, counsel for the Restructuring Subcommittee distributed copies of the First Amendment that had been filed on the docket hours before. Feb. 7, 2019 Hr'g Tr. at 56:3-8 (A-5738) ("MR. BRITTON: I have an amendment to the asset purchase

agreement that was filed by the debtors this morning. . . . I have a copy here that I can hand up to your Honor. THE COURT: Okay.").

On February 8, 2019, the Bankruptcy Court entered the order approving the sale of substantially all of the Debtors' assets to Transform. *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief*, ECF No. 2507 (the "Sale Order") (A-510). The Sale Order makes clear that the First Amendment would not be attached as an exhibit, but rather that Exhibit B to the Sale Order would be the January 17, 2019 version of the APA, "as may be amended and restated from time to time, **including pursuant to that certain Amendment No. 1.**" *Id*. at 2 (emphasis added). Footnote 3 of the Sale Order, inserted where the Sale Order defines the term Asset Purchase Agreement, stated that "Amendment No. 1 to the Asset Purchase Agreement was filed in substantially final form on February 7, 2019 at Docket No. 2456 (the **'APA Amendment'**). Upon Closing and execution the Debtors will file the executed version of the APA Amendment with the Court." *Id.* at 2 n.3.

The final version of the First Amendment was executed on February 11, 2019, and the APA sale closed that same day. The Debtors filed the executed First

Amendment with the Bankruptcy Court on February 14, 2019. *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement*, ECF No. 2599 (A-1713).

The provision of the First Amendment amending Section 2.13(a) of the APA did not change between the draft provided to (and proffered as an exhibit by) the UCC during the sale hearing, and the final version of the First Amendment executed on February 11 and filed with the Court on February 14.  ECF No. 9485, O'Neal Decl., Ex. B (A-909), Redline between 2.13 Language in Attachment to Ex. A and the final version of the First Amendment at ECF No. 2599 (A-2145).

As the Bankruptcy Court observed, the UCC "was looking over [the restructuring] committee's shoulders … and casting a skeptical eye on the asset purchase agreement." Apr. 27, 2021 Hr'g Tr. at 57:24-58:2 (A-7025-7026).  Yet, neither the UCC nor any other party in interest objected to the terms of the executed First Amendment when it was filed on the docket more than 30 months ago or asserted that it had not had sufficient time to review it.

B.      **Post-Sale Course of Conduct**

i.      **The Transfer of the Foreign Subsidiaries**

The Foreign Subsidiaries were owned by the Debtors prior to the sale, and the Debtors therefore were best situated to confirm that the Foreign Subsidiaries' assets as of the Closing Date included the cash in their bank accounts.  And shortly after

the Closing Date, on March 4, 2019, in response to a request from the Debtors, Keith Stopen (a former employee of the Debtors who became employed by Transform post-closing) sent the Debtors' advisors balance sheets that indicated the Foreign Subsidiaries held more than $6 million in cash as of February 2, 2019. *See Declaration of Keith Stopen in Support of Transform Holdco LLC's Supplemental Memorandum of Law in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9486 ("Stopen Decl."), Exs. A (A-5004) and B (A-5006), Email from Keith Stopen of Transform and Attachment (Mar. 4, 2019).

On April 9, 2019, pursuant to the amended Section 2.13(a), Transform elected to acquire "all of the equity interests" in the Foreign Subsidiaries. *Declaration of Charles W. Allen in Support of Transform Holdco LLC's Brief in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9427 ("Allen Decl."), Ex. A (A-4616), Email from Kristen Arn-O'Rourke (Apr. 9, 2019) (providing notice that Transform "deemed it necessary and desirable to acquire all of the equity interests identified below as Acquired Foreign Assets," including "[a]ll equity interests held by Sellers or their Subsidiaries in each of" the Foreign Subsidiaries). That same day, the Debtors confirmed receipt of Transform's election to acquire the equity interests in the Foreign Subsidiaries. *Id.*, Email from Francesca Cohen (Apr. 9, 2019) ("We confirm receipt of your notice.").

Transform and the Debtors immediately proceeded to negotiate the relevant documents to consummate the transfer of the equity interests in the Foreign Subsidiaries. On April 16, 2019, the Debtors transferred all of the equity interests in the Hong Kong Subsidiaries to Transform. Allen Decl., Ex. B (A-4620), Share Purchase Agreement (Apr. 16, 2019) (the "Hong Kong SPA"). The Debtors did not seek to carve any assets out of this transfer, and specifically did not attempt to carve out the cash in the bank accounts. Following the transfer, Transform used the cash in the Hong Kong Subsidiaries' bank accounts to fund the Subsidiaries' operations, and subsequently injected more liquidity into the Hong Kong Subsidiaries for their ongoing operations.

### ii. For More Than Two Years, No Party Objects to the Validity of the Against First Amendment

For more than 26 months, despite extensive litigation over the APA, no party ever suggested that the First Amendment or any provision thereof – including Section 2.13 – had been adopted without proper notice. The language at issue was offered into evidence during the Sale Hearing and filed on the docket prior to the close of the Sale Hearing, and the Sale Order specifically referenced the substantially final form of the First Amendment (final as to Section 2.13) and the fact that the executed version of the First Amendment would follow. Neither the UCC nor any creditors ever suggested that they had not received proper notice of any provision of the First Amendment, nor did they ever raise any objection regarding Section 2.13

15

with the Bankruptcy Court until the Debtors filed their third motion to enforce the APA in April 2021. *Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9395 (A-4532).

Over the last two years, the Debtors have filed at least four motions to seek turnover from or enforce the APA against Transform, and the Debtors and Transform have each raised a broad array of disputes under the APA, many of which they have litigated before the Bankruptcy Court. *See, e.g.*, ECF Nos. 2796 (A-2243), 4029 (A-2490), 6084 (A-4174), 9106 (A-4454). In the course of the parties' APA disputes over the last two years, both the Debtors and Transform have always treated the APA and First Amendment as a single integrated agreement, and no party nor third party has ever raised any concerns about lack of notice regarding the First Amendment. Indeed, the parties' defined term "APA" in these APA disputes has incorporated both the Asset Purchase Agreement executed on January 17, 2019, and the First Amendment executed on February 11, 2019. *See, e.g.*, *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation*, ECF No. 2796 at 2 (A-2244) (defining "APA" as "that certain Asset Purchase Agreement, dated January 17, 2019 (as amended on February 11, 2019, and as amended or modified from time to time)"); *Debtors' Brief in Opposition to Transform Holdco LLC's Adversary*

*Complaint and in Further Support of Debtors' Supplemental Motion to Enforce the Asset Purchase Agreement*, ECF No. 4430 at 1 (A-2952) (same).

The parties have frequently relied on the terms of the First Amendment in the course of their APA disputes, and the Bankruptcy Court's decisions resolving these disputes relied on the APA as revised by the First Amendment.  For example, the Bankruptcy Court relied on language in the First Amendment to resolve disputes involving EDA funds (First Amendment § 1.02 (amending APA § 2.1(p)), mechanics' liens (First Amendment § 1.44 (amending APA § 9.11(a)(vi))), and property in Hoffman Estates (First Amendment § 1.48 (amending APA Schedule 1.1(p))). *See, e.g.*, July 11, 2019 Hr'g Tr. at 130:24-131:3 (A-6169) ("THE COURT: [T]he first of the disputes between Transform, the buyer, and the Sears Debtors over the meaning and enforcement of their asset purchase agreement as amended pertains to Section 2.1(a) of the agreement . . . ."); Sept. 12, 2019 Hr'g Tr. at 238:18-21 (A-6647) ("THE COURT: I have not changed my mind on my interpretation of Section 2.3(p), and how that ties into Section 9.11. . . . [B]oth of these provisions appear in the first amendment.").  None of the changes to the provisions set forth in the First Amendment involving mechanics' liens, EDA funds, or property in Hoffman Estates, including ones involving disputes decided in favor of Transform, were subject to exceptional notice or specifically discussed during the Sale Hearing.

### iii. After Two Years' Silence, the Debtors Assert and Abandon Theories for Turnover of the Foreign Subsidiary Cash

For nearly two years, no Party questioned that Transform had acquired "all of the equity interests" in the Foreign Subsidiaries, including the Foreign Subsidiary Cash. Until January 2021, the Debtors had never demanded the Foreign Subsidiary Cash from Transform. Nor had the Debtors ever identified the Foreign Subsidiary Cash as belonging to the estates. For example, the Debtors never included the Foreign Subsidiary Cash in the "administrative solvency" trackers – which tracked all of the Debtors contingent assets – that were filed with the Bankruptcy Court in connection with the solicitation and confirmation of the Plan.[6] *See, e.g.*, *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors*, ECF No. 4478, Exhibit C (A-3485). Nor did the Debtors include the Foreign Subsidiary Cash in the sworn testimony of Brian Griffith filed with the Court in connection with the confirmation of the Debtors' Plan. *Declaration of Brian J. Griffith in Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, ECF No. 5148 (A3843). In fact, on January 21, 2021 – four days

---

[6]     The Debtors' Plan was confirmed by the Bankruptcy Court on October 15, 2019, but nearly two years later, the Plan has not yet become effective because they cannot satisfy the Bankruptcy Code's requirement to pay all administrative creditors in full. 11 U.S.C. §1129(a)(9). According to the Debtors' recent estimates, there is an $80.5 million gap between their available cash and the remaining amounts owed on administrative, priority, and secured claims. *See Status Report*, ECF No. 9680 (A-5225).

before the Debtors first claimed ownership of the Foreign Subsidiary Cash – the
Debtors filed a status update with the Bankruptcy Court that made no reference to
the Foreign Subsidiary Cash being property of the estates, even though this filing
purportedly listed all of the Debtors' estimated remaining asset recoveries.  *Status
Report: Sears Holdings Status Update Presentation to the Court*, ECF No. 9249 (A-
4523).

On January 25, 2021, the Debtors sent a letter to Transform, asserting for the
first time that they were entitled to the Foreign Subsidiary Cash under the APA.
Allen Decl., Ex. D (A-4638), Letter from Jennifer Brooks Crozier (Jan. 25, 2021).
The Debtors' initial theory was that the Foreign Subsidiary Cash was an "Excluded
Asset" under Section 2.2(f) of the APA.  *Id.*  But Transform pointed out that the
definition of "Excluded Assets" was limited to the rights of the "Sellers" in those
assets, and that the Foreign Subsidiaries were not "Sellers" as defined in the APA.
Allen Decl., Ex. E (A-4641), Letter from Sean O'Neal at 2 (Feb. 1, 2021); *see also*
n.5, *supra*.  The Debtors then abandoned their initial argument and pivoted to argue
that they had acquired the Foreign Subsidiary Cash under the first sentence of
Section 2.13(a), which provides that Transform could opt to acquire only "those
assets that would have been Acquired Assets had the Sellers held them as of the
Closing Date and . . . assume only those liabilities that would have been Assumed
Liabilities."  Allen Decl., Ex. F (A-4646), Letter from Jennifer Brooks Crozier at 2

(Feb. 11, 2021).   But Transform pointed out that this argument ignored that Transform had elected the second option to acquire "all of the equity interests" of the Foreign Subsidiaries, "in lieu of" certain of their assets and liabilities.   Allen Decl., Ex. G (A-4652), Letter from Sean O'Neal at 2 (Feb. 19, 2021).

The Debtors waited another six weeks before seeking relief from the Bankruptcy Court, where they abandoned all of the theories they had asserted in these initial letters.

## II.  PROCEDURAL HISTORY AND RULING PRESENTED FOR REVIEW

On April 6, 2021, the Debtors filed the Third Motion to Enforce.  *Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9395 (A-4532). The Debtors argued that they were entitled to the Foreign Subsidiary Cash under the unambiguous terms of the First Amendment.  At oral argument on April 27, 2021, the Bankruptcy Court *sua sponte* raised the question as to whether the parties had received proper notice of Section 2.13 of the First Amendment, an issue that had not been briefed by the parties.  This was the first time anyone had suggested any issue regarding proper notice, more than 26 months after the parties had executed the First Amendment.  The hearing was not an evidentiary hearing, no witnesses were presented, and the Bankruptcy Court did not admit any documents into evidence. *See* Local Rule 9014-2 of the United States Bankruptcy Court for the Southern

District of New York (the first scheduled hearing in any contested matter may not be an evidentiary hearing).

At the conclusion of oral argument, the Bankruptcy Court ruled from the bench, issuing a preliminary ruling in the Debtors' favor. The Bankruptcy Court first noted that the parties agreed that the APA is governed by Delaware law, and that "Delaware courts start with the text of the[] agreement," and "give effect to the plain meaning of the contract's terms and provisions." Apr. 27, 2021 Hr'g Tr. at 55:14-19 (A-7023). "[U]nless there is an ambiguity in the language of the agreement, Delaware courts interpret the contract terms according to their pla[i]n ordinary meaning." *Id*. at 55:22-24; *see also id.* at 56:14-17 ("[A] court under Delaware law . . . should not look to parol evidence or extrinsic evidence if the terms of an agreement are not ambiguous.").

Assessing the plain meaning of Section 2.13, the Bankruptcy Court found that "the arguments of both sides are reasonabl[y] counterbalanced against each other." *Id.* at 59:5-6. In Transform's favor, the Bankruptcy Court found that there was no real ambiguity that an acquisition of "all of the equity interests" of the foreign subsidiaries included all of their assets: "[I]t is generally within the contemplation of people that when you buy stock, you get the underlying assets of the company whose stock has been sold to you, subject to any claims against that company, of course, which would have priority over the stock." *Id.* at 61:6-10. However, the

21

Bankruptcy Court found that "[t]he context here would argue [for] a more nuanced reading of this agreement and would accord more weight to the Debtors' interpretation of the phrase, 'deemed to be acquired foreign assets,' namely, that the parties . . . intended to exclude from the assets transferred the cash and other excluded assets from the businesses that were transferred." *Id.* at 61:11-18. The Bankruptcy Court noted, however, that it would have been clearer if the parties made this exclusion explicit "and the parties did not do that." *Id.* at 61:19-21.

The Bankruptcy Court did not explicitly state whether it found the plain language of Section 2.13(a) to be unambiguous or not. However, it turned next to an analysis of parol evidence – namely, the conduct of the parties at the Sale Hearing and whether the changes to Section 2.13 (as Transform interprets them) were properly noticed. The Bankruptcy Court noted that "it does not appear to me that the material change that would be represented by Transform's reading of this provision was, in fact, ever described to the Court or in any meaningful way before parties in interest and the Court, and indeed was not approved by the Court," observing that the Sale Order "did not attach the Exhibit B that was supposed to be the amendment . . . and then provided in paragraph 54 that changes could be to the asset purchase agreement only if they were not material." *Id.* at 62:4-14.

Relying on this parol evidence, the Bankruptcy Court concluded "that the Debtors' interpretation is the better interpretation, and that any balance as between

the two should be construed against Transform, given the circumstances of the submission of the amendment – or non-submission rather – to the Court and parties in interest in any way that would highlight the important change that Transform's interpretation would provide for." *Id.* at 62:15-21.

Having ruled in the Debtors' favor on the interpretation of the contract, the Bankruptcy Court next rejected Transform's arguments that the Debtors should be equitably estopped or be deemed to have acquiesced in Transform's interpretation.[7] The Court observed that acquiescence "is a doctrine that requires a showing of the acquiescence, which would then be binding on a party in interest, where that party has full knowledge of his rights and material facts at the time and remains inactive for a considerable period of time or freely give[s] recognition to the act or conducts himself in a manner inconsistent with any subsequent repudiation of the act, thereby leading the other party to believe the act has been approved." *Id.* at 63:9-17.

In rejecting Transform's acquiescence argument, the Bankruptcy Court relied on the "uncontroverted" declaration of Enrique Acevedo, despite the fact that Mr. Acevedo's declaration had not been admitted into evidence and Mr. Acevedo had not been made subject to cross-examination at the hearing. *See id.* at 63:19.  The

---

[7]      Transform is not appealing the Bankruptcy Court's rejection of its equitable estoppel argument based on the Debtors' agreement to deduct from the Bankruptcy Court judgment the portion of the Indian Gains Tax that was assessed based upon the cash held in the Indian Subsidiaries' bank accounts.  Transform had paid this Tax in reliance on the Debtors' knowledge that it was based on a valuation of the Indian Subsidiaries that included the cash in their bank accounts.

Court found that Mr. Acevedo's declaration "show[ed] that the Debtor[s] did not have the critical fact of the dollar amount of cash in the Debtors' bank accounts . . . until well after the stock transfer." *Id.* at 63:20-24.  The Court additionally found – again relying upon parol evidence as to the Parties' actions at the Sale Hearing – that Transform "should not reasonably have believed that merely the Debtors' inaction, even assuming there was inaction, was sufficient to really think that this material change had received the requisite approvals, i.e., after due notice and Court approval." *Id.* at 64:7-11.

The Bankruptcy Court granted supplemental briefing "to address the context of the transaction" on the issues of whether there was adequate notice and whether the amendments to Section 2.13(a) of the First Amendment were material.  *Id.* at 54:8.  After the parties submitted their supplemental briefing, the Bankruptcy Court informed the parties by email on June 3, 2021 that it had reviewed the briefing and requested that the Debtors email a proposed order to Chambers granting the Third Motion to Enforce.  The Bankruptcy Court did not issue any further written or oral explanation for its ruling, nor did it address the parties' supplemental briefing.

On June 15, 2021, the Bankruptcy Court entered the order granting the Third Motion to Enforce.  *Order Granting the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9574 (A-5193).  Transform timely appealed the following day.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court erred, as a matter of law, in interpreting amended Section 2.13(a) of the APA, which grants Transform the unilateral right to elect to acquire "all of the equity interests" in the Foreign Subsidiaries. "[A]ll of the equity interests" in the Foreign Subsidiaries unambiguously means all of their assets and all of their liabilities, including the Foreign Subsidiary Cash.

The Bankruptcy Court also erred to the extent it found the contractual language in Section 2.13(a) to be ambiguous and erred by considering parol evidence outside the four corners of the contract. Alternatively, even if the Bankruptcy Court properly deemed Section 2.13(a) to be ambiguous and did not err in consulting parol evidence, it erred both by relying on this evidence without holding an evidentiary hearing and by finding that the parol evidence presented by the Parties favors the Debtors.

Finally, the Bankruptcy Court committed legal error by rejecting Transform's acquiescence argument in finding the Debtors lacked the requisite knowledge, ignoring the fact that Debtors had full opportunity to know the amount of cash sitting in the Foreign Subsidiaries, and instead relying on the Acevedo Declaration, which was not and could not have been entered into evidence.

**ARGUMENT**

## I. THE BANKRUPTCY COURT ERRED IN CONSTRUING THE APA TO PROVIDE THAT TRANSFORM DID NOT ACQUIRE ALL OF THE ASSETS OF THE FOREIGN SUBSIDIARIES

This appeal turns on a simple question of contract interpretation: When Transform acquired "all of the equity interests" in certain of Sears' foreign subsidiaries, did it acquire all of the Foreign Subsidiaries' assets, including cash held in these foreign subsidiaries' bank accounts at the time of closing? The answer is plainly "yes." As the Bankruptcy Court acknowledged, it is generally understood that when you buy all of the stock of a company, you acquire all of that company's assets (and liabilities). Apr. 27, 2021 Hr'g Tr. at 61:6-10 (A-7029).

Under Delaware law,[8] where contract language is unambiguous, the court's analysis must begin and end with the plain language of the contract. "To determine what contractual parties intended, Delaware courts start with the text." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). "Clear and unambiguous language . . . should be given its ordinary and usual meaning." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Under Delaware law, courts interpreting contracts will "give effect to the plain-meaning of the contract's terms and provisions." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010). "Unless there is ambiguity, Delaware courts interpret contract

---

[8]     The APA and First Amendment are governed by Delaware law. *See* APA § 13.8(a).

terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Lee*, 267 F.3d at 178.

### A. Transform Acquired the Foreign Subsidiary Cash under the Plain Language of Section 2.13(a) of the APA

Section 2.13(a) of the APA, as amended, presented Transform with a choice: Transform could either (i) purchase only certain assets and assume only certain liabilities of the Foreign Subsidiaries, or (ii) it could, "in its sole discretion," choose to "acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a)." Here, Transform chose the latter option by "notif[ying] the Seller that it is necessary or desirable to acquire all of the equity interests" in the Foreign Subsidiaries. APA § 2.13(a); Allen Decl., Ex. A (4616), Email from Kristen Arn-O'Rourke (Apr. 9, 2019) (providing notice that Transform "deemed it necessary and desirable to acquire all of the equity interests identified below as Acquired Foreign Assets," including "[a]ll equity interests held by Sellers or their Subsidiaries in each of" the Foreign Subsidiaries).

There is no real debate as to whether "all of the equity interests" included the Foreign Subsidiary Cash. Judge Drain recognized that the term "all of the equity

interests" is generally understood to include all of the underlying assets, and the Debtors did not contest this point.  At no point have the Debtors argued that the plain meaning of "all of the equity interests" excludes the Foreign Subsidiary Cash.

Instead, the Debtors' argue that there is no real difference between the choices that Transform bargained for in Section 2.13, asserting that Transform acquired the exact same assets whether it completed an asset purchase or acquired all of the subsidiaries' stock.  Under the Debtors' interpretation, Transform was limited to acquiring assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date, notwithstanding Section 2.13's clear direction that Transform's election to acquire all equity interests was "in lieu of" the purchase of only certain assets that would have been Acquired Assets (and assumption of only certain liabilities that would have been Assumed Liabilities) contemplated in the first sentence of Section 2.13(a).

As Transform argued before the Bankruptcy Court, the dictionary definition of "in lieu of" dictates that the former option must be distinct from the latter option. *See* *Lieu*, *Merriam-Webster* *Dictionary*, https://merriam-webster.com/dictionary/lieu (last visited Aug. 13, 2021) (defining "in lieu of" as "in the place of; instead of"); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not

defined in a contract."). The Debtors' proffered reading simply ignored the key phrase, "in lieu of," violating the fundamental canon of contract interpretation under Delaware law that each word be given effect. *See Matria Healthcare, Inc. v. Coral SR LLC*, C.A. No. 2513-N, 2007 WL 763303, at *6 (Del. Ch. Mar. 1, 2007) ("[W]hen possible, the Court should attempt to give effect to each term of the agreement."). The Debtors' interpretation would also render the second option to be mere surplusage, violating a second fundamental canon of contract interpretation under Delaware law. *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (a court interpreting a contract must "give each provision and term effect, so as not to render any part of the contract mere surplusage").

The Bankruptcy Court credited the Debtors' argument, however, finding that "the proper usage of the term [in lieu of] contemplates a change in form and not in value, i.e., X in lieu of salary." Apr. 27, 2021 Hr'g Tr. at 61:25-62:1 (A-7029). The Bankruptcy Court did not cite any authority supporting this legal conclusion. The Bankruptcy Court's narrow use of "in lieu of" contravenes the dictionary definition of that term, which provides that it is synonymous with "instead of." *Lieu, Merriam-Webster Dictionary*, https://merriam-webster.com/dictionary/lieu (last visited Aug. 13, 2021). It also defies the common usage of "in lieu of," which frequently is employed to set off two distinct options that differ in value, as illustrated by such use in several recent Second Circuit decisions. *Tiffany & Co. v. Costco Wholesale*

*Corp.*, 971 F.3d 74, 80 n.1 (2d Cir. 2020) ("[A] plaintiff may also elect to receive statutory damages in lieu of profits and/or damages."); *Milligan v. CCC Information Servs. Inc.*, 920 F.3d 146, 150 (2d Cir. 2019) ("GEICO calculated her loss with respect to the 'adjusted vehicle value' or 'market value' in lieu of the statutorily-required 'reasonable purchase price.'"); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018) ("[T]he parties have entered into a settlement agreement that forgoes retrial on vacatur and remand in lieu of a specified total money payment to the bellwether plaintiffs."). In construing the APA in the Debtors' favor, the Bankruptcy Court compounded its legal error: It disregarded both the plain language meaning of "all of the equity interests" and the dictionary definition of "in lieu of."

**B.      The Debtors Seek to Make a Legal Fiction a Reality**

The Debtors' primary argument before the Bankruptcy Court was that "all of the equity interests" must exclude cash in the Foreign Subsidiaries' bank accounts because Section 2.13(a) states that those "equity interests shall be deemed to be Acquired Foreign Assets" and therefore must include only those assets of the type that would have been Acquired Assets had they been held by the Sellers, rather than the Sellers' non-debtor subsidiaries, as of the Closing Date.

This argument distorts the meaning of "deemed," which does not transpose the qualities of "Acquired Foreign Assets" on "all of the equity interests." Rather, it means that the defined term "Acquired Foreign Assets" includes these equity

interests, such that where that defined term is used elsewhere in the APA, it incorporates these equity interests.  For example, APA § 2.1(dd) refers to the "Acquired Foreign Assets" as a category of "Acquired Assets" that Transform acquired "free and clear of any and all Encumbrances of any kind."  Because the equity interests in the Foreign Subsidiaries are "deemed" to be "Acquired Foreign Assets" in APA § 2.13(a), they are thereby "Acquired Assets" under § 2.1(dd).

The Debtors cited several non-precedential, out-of-circuit cases before the Bankruptcy Court that they asserted stood for the proposition that the term "deem" can be used to exclude the Foreign Subsidiary Cash from the transferred equity interests by creating a legal fiction.  *See Debtors' Reply in Further Support of Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9436 at 6-7.  But these cases actually support Transform's position because they all found that the creation of a legal fiction does not transform the nature of an underlying object.  For example, in *In re Lucas*, 477 B.R. 236 (Bankr. M.D. Ala. 2012), the court found that where a consent judgment "deemed" the amount of the judgment to be held in trust, it did not transform the amount due into an express trust.  Similarly, in *Wohl v. Owen*, 580 N.Y.S.2d 854, 855 (N.Y. Sup. Ct. 1992), where a lease "deemed" a 414 square foot office to be 660 square feet, the court recognized that the lease did not actually make the space bigger nor "even make a pretense that 660 is an accurate number."

Here, the equity interests remain equity interests no matter what they are "deemed" to be in the APA. Creating a legal fiction that the equity interests are "deemed" to be something else does not change the underlying nature of the equity interests themselves. And no legal fiction can carve out assets from "all of the equity interests" any more than a legal fiction can create an express trust or expand the square footage of an office.

The Bankruptcy Court credited the Debtors' interpretation of "deemed to be," noting that the term only appears in the First Amendment. Apr. 27, 2021 Hr'g Tr. at 61:2-5 (A-7029) ("[T]he phrase acquired foreign assets really had not [sic] meaning in the original agreement and only applies to terms in the amendment which are, in essence, self-referential to paragraph 2.13."). But the frequency of use of the defined term "Acquired Foreign Assets" in the APA is irrelevant given that "deemed to be" cannot turn equity interests into something that they are not. Whether the APA refers to "Acquired Foreign Assets" one time or a hundred times is of no moment.

Moreover, the APA and First Amendment to the APA are one integrated document, and the APA as amended includes references to "Acquired Foreign Assets" in sections 2.1(dd), 2.4, and 2.13(a)-(c) (where it appears nine times). For example, Section 2.13(a) provides the Debtors with certain rights if the transfer of the "Acquired Foreign Assets" triggers any right of first offer or right of first refusal.

"Deeming" the equity interests to be "Acquired Foreign Assets" allowed the Parties to use this defined term as a shorthand, rather than having to repeatedly refer to "the Acquired Foreign Assets or equity interests."

## II.   THE BANKRUPTCY COURT ERRED BY CONSULTING PAROL EVIDENCE TO INTERPRET UNAMBIGUOUS CONTRACT LANGUAGE

As described above, the plain language of the APA unambiguously provides that Transform acquired the Foreign Subsidiary Cash.  Where contract language is clear and unambiguous, "resort to parol evidence is not only unnecessary but improper."  *Lee*, 267 F.3d at 178; *see Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) ("[I]f the instrument is clear and unambiguous on its face," the court may not consider external evidence to "interpret it or search for" the parties' intent.); *see also* Apr. 27, 2021 Hr'g Tr. at 55:22-24 (A-7023) ("[U]nless there is an ambiguity in the language of the agreement, Delaware courts interpret the contract terms according to their plain ordinary meaning.").  Where "the meaning of the obligation is clearly spelled out within the four corners of the agreement, parol evidence about the content of the negotiations or what either party subjectively intended to agree to is not admissible."  *SimplexGrinnell LP v. Integrated Systems & Power, Inc.*, 642 F. Supp. 2d 167, 190 (S.D.N.Y. 2009) (Lynch, J.).

The Bankruptcy Court did not explicitly state whether it found Section 2.13(a) of the APA to be ambiguous.  The Court merely stated that the Parties' contractual

arguments were "reasonbl[y] counterbalanced."  Apr. 27, 2021 Hr'g Tr. at 59:5-6

(A-7027).  Yet, without ever holding that the APA was ambiguous, the Bankruptcy

Court *sua sponte* consulted several categories of parol evidence to interpret the APA.

These categories included the "overall context" of the transaction,[9] the conduct of

the parties during the Sale Hearing,[10] the effect on the Debtors' estates,[11] and

whether notice was provided to the UCC.[12]  The Bankruptcy Court then ruled for the

Debtors on the basis of an argument that the Debtors did not make, relying on

evidence outside the four corners of the contract.

The Bankruptcy Court erred if it concluded that the APA was ambiguous.  "A

contract is not rendered ambiguous simply because the parties do not agree upon its

proper construction.  Rather, a contract is ambiguous only when the provisions in

controversy are reasonably or fairly susceptible of different interpretations or may

have two or more different meanings."  *Rhone-Poulenc Basic Chems. Co. v. Am.*

---

[9]     Apr. 27, 2021 Hr'g Tr. at 62:3 (A-7030).

[10]     *Id.* at 62:4-8 (relying on "the fact that it does not appear to me that the material change that would be represented by Transform's reading of this provision was, in fact, ever described to the Court or in any meaningful way before parties in interest and the Court"); *Id.* at 62:16-21 ("[A]ny balance as between the two should be construed against Transform, given the circumstances of the submission of the amendment – or non-submission rather – to the Court and parties in interest in any way that would highlight the important change that Transform's interpretation would provide for.").

[11]     *Id.* at 58:3-7 ("There is no doubt in my mind that Transform's interpretation of the relevant provision to the present dispute, namely Section 2.13 as amended in amendment number one, would materially and adversely to the Debtors' estate modify the [APA].").

[12]     *Id.* at 57:11-58:10.

*Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992).   The APA is not ambiguous; "all of the equity interests" plainly means that Transform was acquiring the stock of the subsidiaries, and thus all of their assets and all of their liabilities, including the Foreign Subsidiary Cash.   The Bankruptcy Court committed reversible error by consulting parol evidence where there was no underlying ambiguity.  *See, e.g., Altra Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

If, on the other hand, the Bankruptcy Court concluded that the APA unambiguously favored the Debtors, it erred by consulting parol evidence to reach that conclusion.  *See, e.g.*, *Lee*, 267 F.3d at 178 (using parol evidence to interpret an unambiguous provision is "unnecessary" and "improper").  The Bankruptcy Court stated that it was appropriate to "consider undisputed background facts to place the contractual provision in its historical setting."  Apr. 27, 2021 Hr'g Tr. at 56:20 (A-7024).  But neither case relied on by the Bankruptcy Court – *S.I. Management L.P. v. Winninger*, 707 A.2d 37, 43 (Del. 1998), and *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) – supports the notion that a court may consult context outside the four corners of the contract to interpret an unambiguous contractual provision.  In both cases, the court explicitly found that the contract was ambiguous and therefore proceeded to consider parol evidence,

including the setting of the agreement, the relationship among the parties to the contract, and the expectation of the parties when they entered the agreement. These cases hold that this type of evidence is extrinsic to the plain language of a contract – not that it may be used to interpret unambiguous contract language.

## III.   THE BANKRUPTCY COURT ERRED BY FINDING THAT THE PAROL EVIDENCE FAVORS THE DEBTORS

Although both Transform and the Debtors argued that Section 2.13(a) was unambiguous, both Parties argued in the alternative that parol evidence supported their arguments. The Debtors filed on the Bankruptcy Court docket parol evidence to attempt to show that they were unaware of the amount of Foreign Subsidiary Cash for much of the more than two year period when they sat silently without raising this issue. *See Declaration of Enrique Acevedo in Support of Debtors' Reply in Further Support of Third Motion to Enforce the Asset Purchase Agreement* (ECF No. 9437) ("Acevedo Decl.") (A-4679). Transform filed on the Bankruptcy Court docket parol evidence about the Parties' course of performance, including the transfer of the Hong Kong Subsidiaries without any attempt to carve out the cash in their bank accounts, the fact that the Debtors never included the Foreign Subsidiary Cash in their administrative solvency trackers filed with the Bankruptcy Court, and the history of the Parties' APA disputes. *See, e.g.*, *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and its Affiliated Debtors*, ECF No. 4478, Exhibit C (A-3485); *Declaration of Brian J. Griffith in*

*Support of Confirmation of Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors*, ECF No. 5148 (A-3843).  At oral argument, the Bankruptcy Court *sua sponte* raised different categories of parol evidence:  the negotiation of the APA, the conduct of the Parties at the Sale Hearing, the notice provided of the First Amendment, and the materiality of changes in the First Amendment.  The Parties then filed supplementary briefing with further parol evidence on notice and materiality, but no hearing was conducted following the filing of these materials.

Even if Section 2.13(a) were ambiguous (it is not), and it therefore was appropriate for the Bankruptcy Court to consult parol evidence (it was not), the Bankruptcy Court erred by finding that the parol evidence favored the Debtors.

*First*, the Bankruptcy Court erred by finding that the parties' interpretation of Section 2.13(a) should be resolved in the Debtors' favor given the "submission of the [First Amendment] – or non-submission rather – to the Court and parties in interest."  Apr. 27, 2021 Hr'g Tr. at 62:18-19 (A-7030).  The Bankruptcy Court's premise that the First Amendment had not been submitted to the Court and all parties in interest during the course of the Sale Hearing, and that the change had been material and adverse to the Debtors' estate, was wrong.

To the contrary, the First Amendment had been the subject of discussion on each day of the Sale Hearing.  *See* 8-12, *supra*.  During the Sale Hearing, the Debtors

provided the UCC with a version of the First Amendment that included the final language of Section 2.13. The UCC then attempted to enter the First Amendment into evidence, and the Debtors filed the First Amendment on the docket, which again included the final language of Section 2.13. The Sale Order specifically referred to the as-filed First Amendment and noted that the executed First Amendment would be subsequently filed with the Bankruptcy Court, which it was on February 14, 2019.

*Second*, the Bankruptcy Court and all parties have consistently relied on the First Amendment throughout the course of the parties' many APA disputes. For more than two years, neither the Bankruptcy Court nor any party questioned the validity of the First Amendment or whether proper notice had been given. The Debtors never raised this issue, and the Bankruptcy Court only did so *sua sponte* for the first time more than two years after the First Amendment had been executed, and after it had formed the basis for many of the Bankruptcy Court's prior decisions.

*Third*, the Bankruptcy Court based its decision in part on its conclusion that the amendment to Section 2.13(a) would constitute a material change to the APA. As a threshold issue, because the Bankruptcy Court raised this issue *sua sponte* and never held an evidentiary hearing, the Debtors presented no evidence as to the materiality of this provision.

Beyond this fatal procedural defect, the Debtors could not have presented evidence that the changes to Section 2.13(a) were material given the amounts at issue

in the overall context of the deal.  The approximately $6.3 million in Foreign Subsidiary Cash does not constitute a material change given that these changes amounted, in dollar terms, to not more than 0.12% of the $5.2 billion sale.  *See e.g., Tosco Corp. v. Oxygenated Mktg. & Trading A.G.*, 1999 WL 328342, at *1-2 (S.D.N.Y. May 24, 1999), *aff'd sub nom.*, *Bayway Refin. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219 (2d Cir. 2000) (finding that a change in the sales contract was not material despite the fact that the amount at issue equaled over 30% of the transaction in dispute).  Indeed, the De Minimis Sale Order classifies all of the Debtors' sales of assets for less than or equal to $15 million as "de minimis," and provides that the Debtors may dispose of these assets without approval from the Bankruptcy Court.  *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments*, ECF No. 856 (A-20).

Further, this $6.3 million figure overstates the amount at issue given that this cash was partially (or entirely) offset by additional liabilities assumed by Transform. When Transform acquired all of the equity interests of the Foreign Subsidiaries, it not only acquired assets that otherwise would have been Excluded Assets under Section 2.2 of the APA, but also assumed liabilities that otherwise would have been Excluded Liabilities under Section 2.4.  This additional assumption of liabilities mitigates any adverse effect to the Debtors' estates that may have been incurred by structuring the transfer of the Foreign Subsidiaries as an equity sale, making the

actual amount at issue arising from the amendment to Section 2.13 even more immaterial.

*Fourth*, it was the Debtors, not Transform, who had the most visibility into the impact – material or otherwise – of the changes to Section 2.13.  Until the Closing Date, the Debtors were best situated to ascertain the cash position of their own Foreign Subsidiaries.  The Debtors had access to and control over the Foreign Subsidiaries' books and records, and acknowledged that they knew they might recover $1 million to $1.5 million from the Foreign Subsidiaries' bank accounts. Acevedo Decl. § 11 (A-4681).  While the Bankruptcy Court characterized Transform as an "insider" and noted that it was controlled by the Debtors' largest shareholder, it did not and could not have found that Transform had greater access to this information than the Debtors and their advisors themselves. *See* Apr. 27, 2021 Hr'g Tr. at 57:11-20 (A-7025).  In the period leading up to the Closing Date, the Debtors had established an independent Restructuring Subcommittee to analyze the transaction with Transform, and Transform did not have control of the books and records of the Debtors or their subsidiaries.  To the extent that the Debtors misunderstood or failed to investigate how much cash was in their own subsidiaries' bank accounts, they have no one to blame but themselves.

*Finally*, the most persuasive parol evidence – the parties' course of performance – makes clear that the Debtors, in fact, understood that "all of the equity

interests" included no carve-out for the Foreign Subsidiary Cash. *See Julian v. Julian*, C.A. No. 1892-VCP, 2010 WL 1068192, at *5 (Del. Ch. Mar. 22, 2010) (under Delaware law, "courts should consider the parties' course of performance as 'the most persuasive evidence of the [meaning of the] parties' agreement'"). Transform elected to acquire "all of the equity interests" in the Hong Kong Subsidiaries on April 9, 2019. The Debtors transferred the equity interests in the Hong Kong Subsidiaries a week later. Under Section 2.1 of the Hong Kong SPA, Transform acquired all of the equity interests in the Hong Kong Subsidiaries. It provides:

> Effective on Completion, on the terms and subject to the conditions set forth in the Master APA, the Seller shall sell, transfer, assign, convey and deliver, and the **Buyer shall purchase**, free and clear of any and all Encumbrances of any kind, nature or description, **the Sale Shares, including all rights that attach** (or may in the future attach) **to the Sale Shares** including, in particular, the right to receive all dividends and distributions declared, made or paid on or after the Completion Date.

Allen Decl., Ex. B (A-4614), Share Purchase Agreement (Apr. 9, 2019) (emphasis added).

In effecting the transfer, the Debtors did not seek to carve out any assets from the Hong Kong Subsidiaries, and specifically did not carve out the cash in their bank accounts. If the Debtors had wanted to exclude that cash, they could have done so. By not doing so, the Debtors acknowledged and agreed that Transform was entitled to that cash, including through "dividends and distributions," which would have

been made from cash.  Nor did Debtors invoke the defined term Acquired Foreign

Assets or any other language from Section 2.13(a).  Only two years later did the

Debtors claim for the first time that they were entitled to claw back cash that was in

the Hong Kong Subsidiaries' bank accounts at Closing.

## IV.   THE BANKRUPTCY COURT IMPROPERLY RELIED ON EVIDENCE OUTSIDE THE RECORD TO DENY TRANSFORM'S ACQUIESCENCE CLAIM

Finally, the Bankruptcy Court erred by rejecting Transform's argument that

the Debtors' claims were barred by the doctrine of acquiescence.  A plaintiff is

barred from relief based on acquiescence in a complained-of act where it "has full

knowledge of [its] rights and the material facts and (1) remains inactive for a

considerable time; or (2) freely does what amounts to recognition of the complained

of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which

leads the other party to believe the act has been approved."  *Klaassen*, 106 A.3d at

1047; *see also Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, Civil Action

No. 8321-VCG, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014) ("[I]naction or

silence on the part of a plaintiff . . . can bar a plaintiff from relief.").  To show

acquiescence, Transform does not need to prove conscious intent, nor does it need

to show a change of position or resulting prejudice.  *Id.*

The Bankruptcy Court denied Transform's acquiescence defense on two

erroneous grounds.  *First*, the Bankruptcy Court stated that the "uncontroverted"

Acevedo Declaration "show[ed] that the Debtor[s] did not have the critical fact of the dollar amount of cash in the Debtors' bank accounts . . . until well after the stock transfer."  Apr. 27, 2021 Hr'g Tr. at 63:19-24 (A-7031).  The Acevedo Declaration asserted that the Debtors understood that the Foreign Subsidiaries only held at most $1 million to $1.5 million in cash in their bank accounts.  Acevedo Decl. ¶ 11 (A-4681).

However, the Acevedo Declaration was not admitted into evidence nor was it "uncontroverted."   The Debtors submitted the Acevedo Declaration in support of their reply brief, ECF No. 9437 (A-4679), and the declaration was not admitted into evidence at the April 27, 2021 hearing.  Nor could it have been:  Under Local Rule 9014-2 of the United States Bankruptcy Court for the Southern District of New York, that hearing – the first scheduled in this contested matter – was not an evidentiary hearing.

Further, Transform did contest this evidence, but did not have an opportunity to cross-examine Mr. Acevedo at the initial hearing.  In its supplemental briefing, Transform identified that Keith Stopen (a former employee of the Debtors who became employed by Transform post-Closing) sent the Debtors' advisors balance sheets that showed the Foreign Subsidiaries held more than $6 million in cash and cash equivalents as of February 2, 2019.  Stopen Decl, Exs. A and B, Email from Keith Stopen of Transform and Attachment (Mar. 4, 2019).   Transform also

requested the opportunity to cross-examine Mr. Acevedo if the Bankruptcy Court held an evidentiary hearing. *Supplemental Memorandum of Law in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement* ECF No. 9483 at 8 n.6 (A-4728).

*Second*, the Bankruptcy Court concluded that Transform "should not reasonably have believed that merely the Debtors' inaction, even assuming there was inaction, was sufficient to really think that this material change had received the requisite approvals, i.e., after due notice and Court approval." Apr. 27, 2021 Hr'g Tr. at 64:7-11 (A-7032). This conclusion was incorrect for two reasons.

*First*, Transform's acquiescence argument was not based on the Debtors' "mere inaction." As Transform explained to the Bankruptcy Court, its reasonable belief in the Debtors' acquiescence was based on the Debtors' actions in transferring all of the assets of the Hong Kong Subsidiaries to Transform, including the cash in the Hong Kong Subsidiaries bank accounts, as well as requiring Transform to pay the Indian Capital Gains Tax and Indian Interest Amount based on figures that assumed the cash in the Indian Subsidiaries' bank accounts was acquired by Transform. *See Transform Holdco LLC's Brief in Opposition to the Debtors' Third Motion to Enforce the Asset Purchase Agreement*, ECF No. 9426 at 18 (A-4610). The Debtors thereby both recognized that this cash belonged to Transform and acted in a manner inconsistent with their subsequent repudiation. *See Klaassen*, 106 A.

3d at 1047.  In any event, silence for more than two years is more than sufficient for purposes of acquiescence under Delaware law.  *See Nevins v. Bryan*, 885 A.2d 233, 246 (Del. Ch. 2005) (finding that silence for 13 months constituted being "inactive for a considerable time" for purposes of acquiescence).

*Second*, as described above, Transform reasonably (and correctly) believed both that the First Amendment had been subject to ample notice and had been approved by the Bankruptcy Court, and that in any event the changes in Section 2.13(a) of the First Amendment were not material.  The record shows that the parties and Bankruptcy Court discussed the First Amendment at each day of the Sale Hearing, the final language of Section 2.13 was sent to the UCC and filed on the docket during the Sale Hearing, the First Amendment was referenced in the Sale Order, and the final version of the First Amendment was executed on February 11, 2019, and filed on the docket on February 14, 2019.  In the context of this $5.2 billion deal, the changes to Section 2.13, which at most affected 0.12% of the total value of the transaction, were not material.

## CONCLUSION

Transform respectfully requests that the Order be reversed and remanded to the Bankruptcy Court to enter judgment for Transform.

Dated:      New York, New York
            August 16, 2021

                        CLEARY GOTTLIEB STEEN & HAMILTON
                        LLP

                        By:   */s/ Sean A. O'Neal*

                              Sean A. O'Neal
                              Andrew Weaver
                              Samuel Levander

                              One Liberty Plaza
                              New York, NY 10006
                              Telephone:  (212) 225-2000
                              Facsimile:  (212) 225-3999

                              *Attorneys for Transform Holdco LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), because it contains 11,642 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
        August 16, 2021

                    By: */s/ Samuel Levander*
                        Samuel Levander